OPINION OF THE COURT
Martha K. Zelman, J.
This is a retention hearing, which is a proceeding wherein the court can either retain a patient or discharge the patient to the street. This hearing was held pursuant to section 9.33 of the Mental Hygiene Law entitled “Court authorization to retain an involuntary patient”: “(a) If the director shall determine that a patient admitted upon an application supported by medical certification, for whom there is no court order authorizing retention for a specified period, is in need of retention and if such patient does not agree to remain in such hospital as a voluntary patient, the director shall apply to the supreme court or the county court in the county where the hospital is located for an order authorizing continued retention. Such application shall be made no later than sixty days from the date of involuntary admission on application supported by medical *701 certification or thirty days from the date of an order denying an application for patient’s release pursuant to section 9.31, whichever is later; and the hospital is authorized to retain the patient for such further period during which the hospital is authorized to make such application or during which the application may be pending. The director shall cause written notice of such application to be given the patient and a copy thereof shall be given personally or by mail to the persons required by this article to be served with notice of such patient’s initial admission and to the mental health information service. Such notice shall state that a hearing may be requested and that failure to make such a request within five days, excluding Sunday and holidays, from the date that the notice was given to the patient will permit the entry without a hearing of an order authorizing retention.”
The patient Philip Hacken is represented by the Mental Health Information Services according to the rules of the Appellate Division. On March 17, 1980 an agreement was entered into by the Office of Mental Health and the Office of Mental Retardation and Developmental Disabilities modifying and amending a co-operative agreement dated October 4, 1978 (hereinafter the Office of Mental Health will be referred to as OMH and the Office of Mental Retardation and Developmental Disabilities will be referred to as OMRDD). This agreement was to establish discrete mental retardation units operated by OMRDD at mutually agreed upon psychiatric centers. In compliance with this agreement, in 1979, a discrete mental retardation unit operated by OMRDD was established in building 40, floor 10 at Creedmoor Psychiatric Center. The multiple disabilities unit at Creedmoor Psychiatric Center determined that there were some patients at that unit other than those transferred to the discrete mental retardation unit, whose diagnosis is mental retardation and who would be appropriate for placement on the discrete mental retardation units and that the unit established in January, 1979 at Creedmoor was operating at maximum capacity and there was a need to expand the unit. Therefore, it was agreed:
(1) OMH will transfer to OMRDD, a ward in building 40 on the 10-A floor, Ward No. 136 which is adjacent to the *702 present OMRDD discrete mental retardation unit for the purpose of expanding the discrete unit. The ward will be transferred to OMRDD within 30 days of the execution of this agreement.
(2) OMH agrees to transfer to OMRDD the staff credit allocations for direct in-patient clinical care which are assigned to the patients transferred to this additional OMRDD discrete unit.
(3) OMH agrees to provide support services including housekeeping, food service and maintenance of the physical plant for the additional ward transferred to the discrete unit and the additional patients.
(4) OMH agrees to provide equipment and furnishings currently being used for the patients in sufficient quantity and quality to meet the needs of patients who will be housed in ward 136 of the expanded discrete mental retardation unit.
(5) OMRDD agrees to operate this unit and to accept patients who meet the criteria set forth in paragraph 2 of the co-operative agreement dated October 4,1978. The number of patients to be accepted on this ward will be up to the maximum number allowed to meet compliance with IGF/ MR standards.
(6) It is further agreed that OMH and OMRDD will designate a screening team composed of a representative from the New York City Regional Office of OMH, a representative from the New York City County Service Group of OMRDD and a clinician from a voluntary agency in Queens, who will be jointly designated by OMRDD Associate Commissioner and the OMH Regional Director, to evaluate the patients that the multiple disabilities unit has identified as being appropriate for discharge from Creedmoor Psychiatric Center and admission to the discrete mental retardation unit. In the event there is a dispute as to the diagnosis and appropriate placement for the patients who are screened by this team, the Associate Commissioner of the New York City County Service Group for OMRDD and the Director of the New York City regional office for OMH will decide where the patient is to be placed. This decision will be made *703 15 days of the notification that there is a disagreement and will be binding on both agencies.
Both commissioners signed this agreement.
In the within hearing, the patient Philip Hacken, an allegedly mentally ill person in this proceeding, appeared before the court. The court was advised that this was a request for an order of retention by Dr. F. Wilde of the multiple disabilities unit, who testified that Mr. Hacken was a 24-year-old white male admitted to Creedmoor Psychiatric Center on July 13, 1971 because of autistic behavior, limited speech, echolalia, behavior disorders hyperactive and withdrawal. The doctor testified that the patient’s present diagnosis was mental retardation severe. The doctor testified that this patient was not suitable to sign a voluntary or informal application, and that he could not function independently, and needed to continue his treatment in a structured setting with supervision.'The court’s attention was called to the fact “that this patient is diagnosed solely as mentally retarded article 9 of the Mental Hygiene Law, under which this proceeding was brought authorized the court to retain those patients in need of care and treatment who are mentally ill. Inasmuch as this patient is nonpsychotic, this patient should be placed in a developmental center or in a discrete unit”. Said memo was submitted by Alfred Besunder, Director, Mental Health Information Service, Second Judicial Department, dated July 13, 1979. The report of the independent panel showed that “the transfer was not recommended. Chart reviewed and patient seen. Ritualized, stereotyped behavior stimulated by cigarette butts, would present severe management problem in close open setting.”
On the other hand, in examining the independent panel’s own screening form, the following questions were answered as indicated:
“5. Does the individual patient have an IQ of 70 or less? [In this case the answer is yes.]
“6. Is the individual patient’s primary diagnosis mental retardation? [In this case the answer is yes.]
“7. Is there currently a psychosis present? [In this case the answer is no.]
*704 “8. Does the intellectual deficit develop prior to age 18? [Yes.]”
It continues to say in this screening form used by the panel, “the individual is eligible for transfer only if questions 5, 6, and 8 were answered yes and question 7 was answered no.” Therefore, in spite of meeting the panel’s own criteria, this boy was not recommended. It was obvious to the court that the only reason he was not recommended is there just (emphasis supplied) was no room for him. It was the court’s feeling (although the court is not a psychiatrist), that the patients were given a very cursory examination by the doctors on the panel. The doctor on the panel testified his examination of the patient amounted to 10 or 11 minutes each patient. It was also shocking to the court to find that treating psychiatrists and psychologists on staff were treating the patients at the psychiatric center for one month and had seen the patient for 10 minutes. The treating doctor knew absolutely nothing about the patient and could tell the court absolutely nothing about why the patient was considered psychotic. This is a violation of this young man’s constitutional rights to “equal protection of the laws” since the other patients meeting the same criteria were transferred to the Bernard Fineson Developmental Center.
There is a second issue which greatly disturbs this court.
As far as this court can determine, the parties are represented as follows: The patient is represented by Mental Health Information Services. Creedmoor Hospital, which is a State agency, is represented by the Attorney-General’s office. OHM and OMRDD which are also State agencies and which are totally independent of each other, are also represented by the Attorney-General’s office. The independent panel, which is created by the above-mentioned agreement, is also represented by the Attorney-General’s office.
What occurred at this hearing and is, therefore, one of the serious issues in this case, is that the legal and medical position of Creedmoor Hospital and OMH and OMRDD were different and contradicted each other. Yet they are represented by the same lawyer who now finds himself representing clients with different legal interests. This court *705 feels that this is a classic example of a conflict of interest and against the best interests of the patients.
This court feels that the retention hearing as held in Special Term Part II of the Civil Term, Supreme Court, Queens County, at Creedmoor Hospital where the court was sitting was an unconstitutional hearing. It is the opinion of the court that to have Creedmoor Hospital represented by the Attorney-Genera?s office of the State of New York, and to have the aforesaid Attorney-General’s office represent the committee established by the OMRDD is a conflict of interest. It is illegal to have the same attorney for two State agencies who have taken adversary positions in this proceeding. It is unreasonable to believe that a patient can be given a just and fair hearing when his attorney, who is the Mental Health Information Service attorney must oppose the Attorney-General’s office, who is working for both the OMRDD and who is acting for Creedmoor Psychiatric Center. The manner in which the hearing is conducted is a violation of the patient’s “due process rights” and “equal protection of the laws”.
Accordingly, the matter is adjourned for 60 days from the date of this decision so that a proper hearing can be conducted to determine the critical issue as to whether the patient should be retained, transferred or discharged.